IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUL 27 2005
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASA Enterprises, Inc.<br>3704 Dana Drive<br>Jackson, Missouri 63755<br><br>Plaintiff,<br><br>v.<br><br>The United States,<br><br>Defendant. | 05-698C<br>No. |

**COMPLAINT**

COMES NOW the Plaintiff, ASA Enterprises, Inc. (ASA), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Army Corps of Engineers (USACE):

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. ASA brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, ASA brings this action directly to the United States Court of Federal Claims within 12 months of the date that the Contracting Officer's Final Decision was received by ASA.

**PARTIES**

3. The Plaintiff, ASA, is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at 3704 Dana Drive, Jackson, Missouri 63755. ASA is a small company with substantial abilities in the areas of engineering and

RECEIVED
OVER THE COUNTER
JUN 27 2005
THE OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

construction, especially on Civil Engineering projects involving earthwork operations. ASA possesses substantial experience on Mississippi River levee projects, and has recently completed a USACE-administered levee enlargement project comparable to the one at issue here near Commerce, Missouri as a subcontractor on that project. ASA always performed well on these projects, and in return, consistently received high performance ratings.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the USACE.

## NATURE AND SUMMARY OF ACTION

5. This action is brought by ASA pursuant to the provisions of the CDA, 41 U.S.C. § 609, seeking recovery against the government for additional costs caused by the USACE's surprise and virtually total clear-cutting of the borrow area forestation in advance of ASA's earthwork operations but following the submission of ASA's bid. The basic theory of the case is that: (a) this clear-cutting denied ASA of the soil-drying benefits of the forestation overlaying the borrow areas; (b) significantly wetter soil caused ASA's earthwork operations to take longer and to become less efficient; and (c) these delays and disruptions increased ASA's cost of performance. Entitlement is supported by a number of independent but complementary legal theories, including differing site condition (DSC), constructive change, failure to disclose superior knowledge, and failure of the USACE to verify ASA's bid. ASA's claim totals $1,881,206, plus interest allowed as per the CDA.

## STATEMENT OF FACTS

### *Overview of the Contract*

6. Although certain matters taking place prior to the award of the contract will be presented in the paragraphs that follow, such matters typically are better put into context once the

contract Statement of Work (SOW) and other key contract provisions are understood. Thus, a discussion of the contract SOW and other requirements are presented first.

7. On June 21, 2002, the USACE awarded ASA Contract No. DACW38-02-C-0026 (the Contract) for enlarging certain earthen levees on the Mississippi River upstream of Vicksburg, Mississippi. Specifically, ASA was responsible for:

> furnishing all plant, labor, materials and equipment, and constructing the Item 477-L, Levee Enlargement in Issaquena County, Mississippi. Principal features of work include mobilization and demobilization, clearing and grubbing, semicompacted levee embankment, removing and replacing existing gravel surfacing, providing new sand-clay-gravel or crushed limestone levee surfacing, mowing and turfing, removing and salvaging existing cattle guards and concrete bedding beams, furnishing and installing new cattle guards and new concrete bedding beams, corrugated metal pipe, protecting existing relief wells, providing as-built drawings (both blue line and electronic), performing associated Contractor quality control (including providing a CQC System Manager who shall perform no other duties in addition to quality control), storm water pollution control and environmental protection.

8. The Contract was for a firm, fixed price of $4,073,516. The present Contract price, including modifications issued to date, is $4,347,911.

9. The Contract period of performance was to begin within 10 calendar days after ASA's receipt of the USACE's Notice to Proceed (NTP) and to conclude within 310 calendar days after such receipt.

10. The Contract required that ASA obtain new embankment material for enlarging the levee from three adjacent river bottom borrow areas, or pits. Two of the pits were owned by Anderson-Tully Co. and the third pit was owned jointly by Anderson-Tully Co. and a private individual.

11. The Contract provided that the trees would remain standing in the borrow areas until such time as ASA cleared them:

3.2 CLEARING

3.2.1 General

Clearing shall consist of the complete removal above the ground surface of all trees, stumps, down timber, snags, brush, vegetation, old piling, loose stone, abandoned structure foundations, abandoned fencing, fencing, drift, trash and similar debris.

3.2.2 Merchantable Timber

The Contractor will not be permitted to sell or retain for his use any merchantable timber or crops remaining within the areas to be cleared on or after the date of award of this contract. The Contractor is precluded from making any claim for time extensions, costs, or damage to his operations by reason of the existence or nonexistence of merchantable timber, crops, debris, or stumps within the areas to be cleared.

3.2.3 Trees

Trees shall be felled in such a manner so as to avoid damage to trees to be left standing, and with due regard for the safety of employees and others.

12. The Contract contained no indication that the USACE, or any third party working at the USACE's direction, would clear any of the trees in the borrow areas.

13. The Contract's drawings showed forestation covering the borrow areas.

*ASA's Underlying Bid Assumptions*

14. Neither the solicitation documents nor the Contract documents dictated the means and methods of performance. Within certain limitations, the bidders were free to employ whatever means and methods of performance that they desired, provided that those means and methods were safe and resulted in a workmanlike and technically acceptable result.

15. A critical element of ASA's excavation strategy was to delay the clearing of trees from the borrow areas as long as possible during the excavation in order to maximize the soil-drying effects of transpiration and of having the trees intercept rainfall and prevent it from

reaching the ground. In essence, ASA planned to clear trees in stages on a "just-in-time" basis, rather than clear-cut them.

16. Another critical element of ASA's excavation strategy was its plan to use self-loading tractor and pan hauling units to remove and load the soil rather than top-loaded, off-road haulers, which are more expensive to operate. Although self-loading tractor and pan hauling units lose traction and thus productivity once the soil moisture content crosses certain thresholds, ASA was confident that it could profitably use such equipment because it expected that the soil would be adequately dry due to the interception and transpiration effects of the trees in the borrow areas.

17. ASA planned to employ a continuous loading, hauling, and placement operation that would allow for a systematic and efficient approach to the levee fill operations. The actual placement activity was expected to be accomplished simply by dumping and spreading the material hauled from the borrow areas and then compacting each lift by the continuous travel of a rubber tired tractor. No special rollers or compactors were expected to be required for this compaction effort, as the technical specifications required only that 90% Proctor density be attained (ASTM No. D-698). For the most part, the travel of the loaded hauling units themselves provided the necessary compaction.

18. For the levee load, haul, and compact work, ASA planned to use for the average embankment haul an equipment spread that included ten tractor-scraper combination units, two dozers, one water truck, one motor grader, and one farm tractor/disc unit. Supplementing that equipment mix would be one survey and testing person and one laborer. ASA based its bid for the levee embankment unit price (CLIN 006) employing this average embankment load, haul,

and compact contingent for a period of operation equivalent in working hours to 160 continuous ten-hour working days.

19. When allocating the foregoing costs over the estimated quantity of levee embankment material of 1,100,000 CY, ASA developed a unit price for CLIN 006 (Levee Embankment, Semicompacted) of $2.47 per CY, with overhead and profit included.

20. The extended pricing for CLIN 006 was $2,717,000, which represented two-thirds of the total extended bid amount of $4,073,516.

21. Again, the means and methods selected by ASA that under-gird its pricing for CLIN 006 were that it be able to employ just-in-time clearing of the trees in the borrow areas and that it be able to utilize self-loading tractor and pan hauling units. Those means and methods, of which ASA was free to choose, were, in turn, heavily dependent upon the drying effects of the interception and transpiration features of the forestation in each of the three borrow areas.

22. Transpiration is the process whereby the moisture that has circulated through a tree structure (as well as plant life generally) is returned to the atmosphere, principally in the form of water vapor. The rate of transpiration varies from one day to another depending upon the temperature, sunlight, moisture available, and other atmospheric conditions.

23. Temperature has a profound effect on the transpiration rate. One basic treatise on Hydrology estimates that transpiration doubles for approximately every 18° F rise in temperature. Transpiration rates also are higher along river banks where the tree roots penetrate what is known as the "capillary fringe." In general, the more moisture available, the higher the transpiration rate.

24. Governmental agencies, including the USACE, for many years have conducted studies and have measured the effects of transpiration on soil moisture content.

25. In a letter dated August 18, 2002 that recounted discussions between ASA and the USACE from a July 23, 2002 meeting, ASA summarized its prior experience with and understandings of the soil drying properties of transpiration in river-side borrow areas. In that letter, ASA writes:

> It was also mentioned [during the parties' July 23, 2002 meeting] that from our prior experience on projects similar in nature (low ground, subject to frequent flooding, Missouri Dept. of Conservation, Coon Island Wildlife Area, Butler County, MO) it was established that the addition of trees above the borrow pits changes the moisture conditions of the soils as compared to open field borrow pits. On that particular project we were finding that to obtain the required moisture content we had to blend the dryer material that was under the trees with the material coming from the open field. *It was from this prospective, that my original bid was based upon.*

(Emphasis added).

26. ASA had every reason to rely on the continued existence of the forestation present in each of the three borrow areas. First, ASA observed the existence of the overlying forestation during the pre-bid walk-down.

27. Second, the Contract drawings included to-scale depictions of three borrow areas designated as Construction Borrow Area Nos. 1, 2, and 3. For each of these construction borrow areas, the drawings included the notation "Woods" within the limits of the borrow areas. Each of the three borrow areas also included the drafter's convention of a "cloud" to mark the perimeter of the woods within the borrow areas. See Drawing Nos. M-15-958, Sheet 2 and M-15-958, Sheet 3. The USACE's Architect / Engineer described these borrow areas in project design records as "riverside tree plantation[s]" consisting of "bottom-land hardwoods."

28. Third, not only were there trees present in the three borrow areas, the trees were part of an actively managed tree plantation owned largely by Anderson-Tully, a company that

specializes in the management and stewardship of hardwood forests all along the Mississippi River.

29. Fourth, unlike in other Vicksburg District USACE contracts where the USACE intends to clear cut a borrow area prior to issuing an NTP to a levee contractor, the USACE did not include in the Contract documents here or otherwise inform ASA that it intended to clear cut in advance of the NTP.

*The USACE Never Requested ASA to Verify its Bid*

30. ASA submitted its bid on the Contract on June 11, 2002 and the USACE awarded the Contract to ASA on June 21, 2002.

31. Prior to its receipt of bids on the Contract, the USACE had adopted the position that it wanted all the merchantable timber from the three borrow areas harvested before the issuance of the Contract NTP. In a May 29, 2002 e-mail message, the USACE internally contemplated whether it should amend the solicitation to advise the bidders of this intended pre-NTP harvesting. Neither ASA nor the other bidders (to ASA's knowledge) were notified prior to the bid due date either formally or informally of this intended pre-NTP harvesting by the USACE.

32. As noted above, CLIN 006 (Levee Embankment, Semicompacted) comprised almost exactly two-thirds of ASA's overall extended bid amount. CLIN 006 bore the same relative weight in both the other offerors' bids and in the USACE's estimate.

33. ASA's unit price for CLIN 006 was $2.47 per CY. The next lowest bidder, Wilco Marsh Buggies, Inc., bid $3.21 for this line item. The USACE's estimate for CLIN 006 was $3.09. This means that ASA's bid for CLIN 006 was 23% lower than the next lowest bidder and 20% lower than the USACE's estimate for that line item. The gulf between ASA's CLIN 006

unit price and the corresponding USACE estimate is even more pronounced than 20%, as government estimates do not include profit. That latter point was confirmed in the Contracting Officer's Final Decision.

34. If one compares ASA's unit price for CLIN 006 with the average unit price submitted by all nine of the other bidders, it becomes clear that ASA's $2.47 per CY is even more of an outlier. Compared with the average unit price of the other nine bidders of $4.12, ASA's unit price for CLIN 006 is 40% lower. These variances were readily calculable from the pre-award bid abstract prepared by the USACE.

35. Despite these gaping, unexamined, and unexplained variances between ASA's bid price for CLIN 006 and all other relevant measures of this pricing, the USACE never approached ASA to verify its bid unit price. The USACE snapped up ASA's offer notwithstanding the pricing anomalies and notwithstanding that the USACE was on the brink of directing action that would dramatically and irrevocably change for the worse the moisture content of the borrow material; that is, directing the clear-cutting the borrow areas.

*The Clear-Cutting and its Aftermath*

36. In July 2002, the USACE notified ASA that the Notice to Proceed would be issued on or about August 1, 2002. While not conveyed to ASA at the time, it is believed that the August 1, 2002 NTP date was established by the USACE in order to accommodate the clear cutting of the borrow areas by that date. In order to plan for a timely mobilization, ASA personnel visited the project site on or about July 12, 2002. Upon arrival, ASA personnel were surprised to see logging crews clear-cutting the trees in borrow area no. 1. ASA learned that the crews were working at the direction of the USACE.

37. ASA had not received any notice from the USACE, or from any other source, that *any* tree clearing would be taking place in *any* of the borrow areas.

38. By a letter dated July 12, 2002, ASA gave the USACE formal notice that the clear-cutting of the trees in borrow area no. 1 constituted a differing site condition. In that letter, ASA's Mr. Poythress stated:

> [I]n accordance with Section 52.236-2 of the Contract Clauses, ASA Enterprises is giving notice of differing site conditions prior to June 11th. On my visit to the site today it was discovered that the Logger's cutting trees had crossed the right-of-way of borrow pit number one and had clear cut the site.
>
> In reference to Section 02111-Clearing and Grubbing, of the contract specifications, no mention or indication is given that another contractor would remove trees after the bid letting. Accordingly, this disturbance has impacted the work in two ways.
>
> 1) With the tru[n]k removed, the removal of the root wad from the ground has been made significantly more difficult.
>
> 2) Without the trees to transpire the moisture from the soil, the in-situ moisture conditions of the soil has been altered, affecting the overall process of levee embankment.

39. On July 30, 2002, without having responded to ASA's letter dated July 12, 2002, the Contracting Officer issued the NTP. As noted above, the issuance of the NTP had been purposefully withheld to allow for this clear-cutting to take place first.

40. Despite ASA's notice, the USACE-directed clear-cutting of trees progressed into borrow area no. 2 and threatened borrow area no. 3. By a letter dated August 5, 2002, ASA again notified the USACE of the existence of the DSC and of the problems posed by the clear-cutting. Specifically, ASA's Mr. Poythress wrote:

> In accordance with Section 52.236-2 of the Contract Clauses, ASA Enterprises is giving notice of differing site conditions prior to June 11th. With the loggers continuing to clear trees in borrow pit Number 2 and

the intent to continue to clear on into borrow pit number 3, this work has impacted my project in two ways:

1) With the tru[n]k removed, the removal of the root wad from the ground has been made significantly more difficult.

2) Without the trees to transpire the moisture from the soil, the in-situ moisture conditions of the soil has been altered, affecting the overall progress of levee embankment.

41. ASA complied fully with the Contract's DSC notice provisions (FAR 52.236-2), inter alia, through its letters dated July 12, 2002 and August 5, 2002.

42. The USACE had knowledge before the Contract was awarded that the clear-cutting of the trees in the borrow areas would take place prior to and during the performance of the Contract. The USACE failed to provide such knowledge to ASA.

43. During performance of the Contract, having been denied the interception and transpiration benefits that would have been provided by the now denuded forestation in the borrow areas, ASA encountered difficulties that slowed down and made more costly ASA's borrow loading and hauling activities. The additional water present in the borrow areas also meant that a higher percentage of the borrow volume hauled was water, which, in turn, added significantly to the number of trips in the hauling operation and made the hauled material more difficult to dry.

44. The higher moisture content of the borrow area soils made the work not just more difficult in degree, but more difficult in kind. The higher moisture content so severely impaired the tractive quality of the borrow material that it completely changed ASA's loading and hauling activities. As ASA's Roger Poythress pointed out in a letter dated June 24, 2003 to the Contracting Officer:

> When bidding the work with tractors and pans (self-loading farm type equipment), I am alerted by subsoil conditions when the in-situ moisture

> conditions approach 30%. Depending on the soil type, it is around this condition when the tractors will lose the necessary traction (friction) to self load themselves effectively and overall production is degraded. A similar analogy would be to compare the functioning of a snowmobile across a frozen lake surface with an ambient temperature of 30 degrees F, as compared to 34 degrees. Implying that even a marginal increase will have dire consequences, when working at such high saturation levels.

45. Stated differently, to the extent that the clear-cutting of the borrow areas caused the moisture content to exceed the tractive threshold of approximately 30%, the USACE-directed deforestation profoundly degraded ASA's loading and hauling operation. As pointed out above, the material placement operation also was severely impacted in that the saturated borrow material had to be dried or aerated before it could be placed and compacted.

46. Even the Contracting Officer in her Final Decision admitted "that conditions encountered at the site were different from those represented in the contract."

47. As the clear-cutting continued, the loss of transpiration caused the soil moisture in the borrow areas to increase substantially. As a result, beginning in or about September 2002, ASA's self-loading tractor and pan hauling units began to lose productivity as the soil moisture increased, thereby increasing ASA's performance costs.

48. To underscore ASA's reliance on the importance of soil-drying benefits of the forestation overlying the borrow areas and the devastating impact that the absence of such benefits had on ASA's earthwork operations, ASA, during a meeting with the USACE on September 25, 2002, formally requested that the Contract be terminated for the convenience of the USACE. Such an action – the offer of a complete surrender of a business opportunity – demonstrates not only how important the soil-drying issue was to ASA, it proves the *bona fides* of ASA's concerns. That is, these concerns are inherently legitimate, in that they were raised in

real time just as the work was getting started – they were not ginned-up in some sort of end-of-the-job "get well" claims campaign.

49. In recognizing the clear-cutting of the borrow area trees as a DSC, the USACE by a Contract modification dated December 20, 2002 increased the Contract price by $180,000, and the period of performance by 67 days, in order to compensate ASA for the additional costs of clearing and grubbing tree stumps and downed treetops. Mr. Poythress' cost proposal for this work dated August 12, 2002 made clear that the pricing "does **not** pertain to the increase [sic] cost resulting from the lack of transpiration that the trees would have provided, just the cost involved from digging up the stumps" (emphasis in original).

50. The USACE-directed clear-cutting of the trees in the borrow areas was the sole cause of ASA's increased performance costs associated with the Contract.

51. Beginning in August, 2002, and continuing into 2003, ASA repeatedly asked the USACE to modify the Contract to compensate it for the loss of transpiration and tree cover. ASA even engaged Dr. Andrew J. Londo, a Mississippi State University forestry professor, in support of its efforts, who concluded in a March 5, 2003 report as follows:

> It is my opinion that had the trees remained on site, till removed by ASA Enterprises, soil conditions would have been drier, with the trees reducing soil moisture content levels to around 20% *in situ* moisture content. This in turn would have enabled ASA Enterprises to conduct the Levee Enlargement Project according to original estimates.

52. While the USACE has never publicly acknowledged ASA's core contention that the lost soil-drying properties from the deforestation of the borrow areas completely changed ASA's borrow operations and subsequently increased its costs, it did admit that the harvesting of trees from the borrow areas constituted a Type I DSC. In particular, the USACE stated in a May 9, 2003 letter from the Contracting Officer to ASA:

> We recognized that harvesting the trees after award of the contract without putting you [ASA] on notice in the contract that the trees would be harvested constituting [sic] a DSC.
>
> * * *
>
> The contract documents did represent that trees covered the borrow areas at the time of award. The Government has recognized that trees were removed prior to commencement of work and that this is a condition that increased the cost of performance.

53. From the NTP until the date of this Complaint, the lost soil-drying properties arising from the deforestation of the borrow areas has changed ASA's earthwork loading, hauling, processing, and placement activities by making that work far less efficient and far more time-consuming. Basically, for the bulk of the 2002 and 2003 construction seasons, ASA had to use its wide-track D-6 dozers to push the top surface material in the pit up on to a stable haul road surface that it had built through the pit in order to allow it to manipulate, disc, and plow the material to the point that ASA had reduced the moisture content enough so that it could then self-load the tractor / scraper units and haul to the new embankment areas on the levee. Thus, ASA had to do a lot of extra work to even be able to get the material out of the borrow area. Once out of the borrow area, the material still had to be dried further at the embankment location in another inefficient and time-consuming operation to get the material dry enough to achieve the required compaction. For the bulk of the 2004 construction season, ASA basically gave up as futile its previous efforts to stage and partially dry the saturated borrow material in the pit. Rather, ASA top-loaded its tractor / scraper units with backhoes and excavators and had to haul the heavily saturated borrow material to the levee embankment location. This resulted in extra and longer trips, more elaborate loading operations, and significantly longer drying time at the final levee fill locations. These impacts were exacerbated by the USACE's hidebound refusal during the first two construction seasons of the project to allow ASA to raise the excavation level

of the borrow areas by the requested two feet, even though the USACE's engineering staff saw no technical barriers to this seemingly innocuous change.

54. The foregoing changes have significantly increased ASA's earthwork operations costs. These problems were exacerbated in 2004 due to the coupling of longer haul distances with wetter borrow material. This downward performance trend is expected to continue in 2005 up until the time the embankment work is complete.

55. Throughout 2003 and into early 2004, ASA used all means at its disposal to attempt to impress upon the USACE the deleterious effects that the lost soil-drying properties arising from the deforestation of the borrow areas were having on ASA's earthwork operations. The USACE, however, refused to move off its position that while the clear-cutting of the borrow area forestation *did* constitute a DSC, the immutable properties of nature that were lost as a direct result of that deforestation *somehow did not*.

56. Ultimately, ASA was not successful in obtaining a modification. Accordingly, by a certified claim dated February 24, 2004, ASA sought an equitable adjustment in the amount $1,881,206 for its increased costs.

57. By letter dated July 2, 2004, the USACE issued its Final Decision denying ASA's claim in its entirety.

58. ASA disagrees with the Contracting Officer's Final Decision in its entirety. In fact, ASA intends to demonstrate at trial that a report of the Engineer Research and Development Center (ERDC) that was attached to the Final Decision fairly calculates the actual volume of water that the forest would have transpired for the affected years but for the USACE-ordered clear-cutting. ASA pleads the following counts:

## COUNT I

**Equitable Adjustment: Failure to Issue Equitable Adjustment for the Additional Costs of Placing Levee Material under the Differing Site Conditions Clause**

59. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60. The Contract includes the Differing Site Conditions (DSC) clause set out at FAR 52.236-2. See Contract, p. 110 of 142.

61. In order to establish a Type I DSC, a contractor must establish the following elements: (a) the contract documents provided affirmative indications of the subsurface or latent conditions at the site; (b) the contractor reasonably interpreted the contract indications and reasonably relied on such interpretations; (c) the conditions actually encountered differed materially from the subsurface or latent conditions at the site; (d) the actual conditions were reasonably unforeseeable; and (e) the contractor incurred additional costs because of the variance between the conditions as indicated and the conditions as actually encountered.

62. With respect to the first element of a Type I DSC claim, the Contract drawings included to-scale depictions of three borrow areas designated as Construction Borrow Area Nos. 1, 2, and 3. For each of these construction borrow areas, the drawings included the notation "Woods" within the limits of the borrow areas. Each of the three borrow areas also included the drafter's convention of a "cloud" to mark the perimeter of the woods within the borrow areas. See Drawing Nos. M-15-958, Sheet 2 and M-15-958, Sheet 3. The presence of heavy forestation in the three borrow areas constitutes an express indication.

63. An inferred or implied indication arising from the foregoing express indication is the natural phenomenon that is well known in the scientific community and well known by the

USACE, including the USACE's Vicksburg District, that the presence of this heavy forestation intercepts rainfall and transpires underlying soil moisture.

64. The second element of a Type I DSC claim is that the contractor must have reasonably interpreted the contract indications and reasonably relied on such interpretations. Here, ASA visited the site prior to bidding the work, observed the presence of heavy forestation in the three borrow areas, confirmed that the existence of this heavy forestation was fully depicted in the Contract documents as existing conditions, relied on the continuation of this wooded condition throughout the period of performance of the Contract, and based its pricing of CLIN 006, "Levee Embankment, Semicompacted," on the continued existence of this wooded condition. The pricing of this CLIN of $2.47 per CY was, in turn, predicated upon the use of just-in-time techniques for obtaining the borrow material and upon the ability of ASA to obtain the borrow material and to deposit it as levee fill utilizing self-loading and self-off loading features of its tractor-double pan hauling units. Implicit in the viability of this plan was ASA's ability to rely on the interception and transpiration benefits to sufficiently dry the borrow material.

65. With respect to the third element – that the conditions actually encountered differed materially from the subsurface conditions indicated in the contract documents – ASA relied on the representations contained in the Contract documents that borrow areas would remain heavily forested and that the interception and transpiration benefits that accompany the presence of such conditions would be available to ASA throughout the course of performance. In reality, with all three borrow areas clear-cut in the advance of earthwork operations, these benefits on which ASA was entitled to rely had become completely destroyed.

66. The fourth element of a Type I DSC claim is that the conditions actually encountered were reasonably unforeseeable. Clearly, ASA's conduct immediately upon discovery of the USACE's decision to clear cut the borrow areas demonstrates that the DSC to ASA was totally unexpected and unforeseen and/or unforeseeable. The USACE also was keenly aware that contractors would not expect a pre-NTP clear-cutting of the borrow areas. For example, it was for that very reason the USACE included a detailed discussion of pre-NTP deforestation under the "Merchantable Timber" clause in the Parker contract, a contract comparable to the instant Contract in those respects. Due to that warning, the pre-NTP clear cutting could not have taken the contractor in the Parker contractor by surprise; in contrast, the lack of a comparable warning here caught ASA completely unaware.

67. The fifth element of a Type I DSC claim – that the contractor incurred additional costs solely because of the changed condition – is satisfied by the fact that because of the increased moisture content in the borrow areas due to the clear-cutting of the existing forestation, ASA had to endure an earthwork loading, hauling, and placement operation that took more time than anticipated and that was rendered significantly less efficient.

68. Moreover, the USACE has admitted that the harvesting of trees from the borrow areas constituted a Type I DSC. In particular, the USACE stated in a May 9, 2003 letter from the Contracting Officer to ASA:

> We recognized that harvesting the trees after award of the contract without putting you [ASA] on notice in the contract that the trees would be harvested constituting [sic] a DSC.
>
> * * *
>
> The contract documents did represent that trees covered the borrow areas at the time of award. The Government has recognized that trees were removed prior to commencement of work and that this is a condition that increased the cost of performance.

69. Having formally made the admission that the harvesting of the trees from the borrow areas constituted a DSC, the USACE is estopped in the instant proceeding from contending otherwise.

70. On February 24, 2004, ASA submitted a properly certified claim in the amount of $1,881,206 that relied, in part, on the Contract's DSC clause as entitlement to the amount requested.

71. In its Final Decision dated July 2, 2004, the USACE denied ASA's February 24, 2004 claim in its entirety.

72. ASA has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, ASA respectfully requests that the Court enter judgment against the USACE on Count I in the amount of $1,881,206, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT II

### Equitable Adjustment: Failure to Issue Equitable Adjustment for the Additional Costs of Placing Levee Material under the Changes Clause

73. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 72 as if fully set forth herein.

74. The Contract includes the Changes clause set out at FAR 52.243-4. See Contract, p. 117 of 142.

75. Under the constructive change doctrine, a contractor must establish the following three elements in order to recover: (a) the minimum performance that the contractor is required

to provide under the contract; (b) the work performed or to be performed exceeds the minimum required; and (c) the government required the contractor to perform this additional work and the contractor did not volunteer the work.

76. Here, the USACE's deliberate act of clear-cutting the three borrow areas in advance of ASA's ability to conduct earthwork operations adversely affected the means and methods employed by ASA in performing its borrow, hauling, and embankment fill operations. This action, while permissible under the Changes clause, entitles ASA to an equitable adjustment for the additional costs incurred by it as a result of this constructive change. ASA was compelled to perform this additional work in order to complete the project; it did not volunteer to perform the additional work on a no-cost basis.

77. On February 24, 2004, ASA submitted a properly certified claim in the amount of $1,881,206 that implicated the Changes clause in establishing its entitlement to the amount requested.

78. In its Final Decision dated July 2, 2004, the USACE denied ASA's February 24, 2004 claim in its entirety.

79. ASA has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, ASA respectfully requests that the Court enter judgment against the USACE on Count II, in the alternative to the relief requested in Count I, the amount of $1,881,206, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT III

**Breach of Contract: The USACE's Failure to Disclose its Superior Knowledge Caused ASA to Incur Additional Costs of Embankment Fill**

80. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 79 as if fully set forth herein.

81. ASA relied on the continued existence of the forestation in the borrow areas and the interception and transpiration properties of this forestation as a key assumption in its just-in-time borrow loading and hauling operation. The wholesale clear-cutting of these trees prior to the commencement of ASA's earthwork operations totally destroyed ASA's planned approach to its borrow loading and hauling activities and caused ASA to incur additional costs.

82. The risk of cost increases to ASA's borrow loading and hauling operation shifts to the government where the government fails to disclose its "superior knowledge" of the vital facts upon which the borrow loading and hauling costs depend. A contractor must satisfy four elements in order to establish a claim for the government's failure to disclose its superior knowledge. The four elements are: (a) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (b) the government was aware that the contractor had no knowledge of and had no reason to obtain such information; (c) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (d) the government failed to provide the relevant information.

83. With respect to the first element, the information is vital because a forested environment intercepts rainfall and transpires the groundwater in the underlying soil. These soil-drying characteristics, in turn, help to keep the moisture content in the borrow area material during the peak construction season below approximately 30%. That lower moisture content

enables the use of self-loading tractor and pan hauling units to excavate the soil rather than top-loaded, off-road haulers, which are more expensive to operate. The selection of such an approach, which is within the province of a construction contractor's "means and methods," results in a lower cost for performing the levee embankment work.

84. The second element, that the government was aware that the contractor had no knowledge of, and had no reason to obtain, such information, can be made out simply by reviewing the pre-award record. The USACE could have, but did not, include a disclosure in the "Merchantable Timber" clause (as it did on other contracts) that it was going to withhold the issuance of the NTP until after timber harvesting. ASA's notice letters dated July 12, 2002 and August 5, 2002 also offer strong evidence in support of this element. Perhaps most telling is that the USACE did not immediately respond to either of these two notice letters and contend *either* that ASA knew during the bid phase of the planned third-party timber harvesting *or* that ASA had been given some indication that should have prompted ASA to investigate further into the possibility of third-party harvesting.

85. The third element, that the contract specification misled the contractor or did not put it on notice to inquire, is readily established as well. The Contract drawings included to-scale depictions of three borrow areas designated as Construction Borrow Area Nos. 1, 2, and 3. For each of these construction borrow areas, the drawings included the notation "Woods" within the limits of the borrow areas. Each of the three borrow areas also included the drafter's convention of a "cloud" to mark the perimeter of the woods within the borrow areas. See Drawing Nos. M-15-958, Sheet 2 and M-15-958, Sheet 3. Additionally, the Contract documents identified the contractor, using its discretion and staging, as the party to cut down the trees, not some third party, and certainly not some third party prior to the NTP. Further, the Contract

documents were misleading because the USACE did not follow the practice employed on other contracts where clear-cutting is planned of stating in the "Merchantable Timber" clause of the Contract that it clearly intended to clear-cut the borrow areas in advance of the issuance of the NTP.

86. The fourth element, that the government failed to provide relevant information, also can be readily established. The record clearly establishes that the pre-NTP clear-cutting of the borrow areas was not disclosed to ASA prior to contract award. In fact, for whatever reason, it appears that the USACE attempted to actively conceal that information from ASA.

87. On February 24, 2004, ASA submitted a properly certified claim in the amount of $1,881,206 that relied in part on the USACE's failure to disclose its superior knowledge in establishing its entitlement to the amount requested.

88. In its Final Decision dated July 2, 2004, the USACE denied ASA's February 24, 2004 claim in its entirety.

89. ASA has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, ASA respectfully requests that the Court enter judgment against the USACE on Count III, in the alternative to the relief requested in Counts I and II, the amount of $1,881,206, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT IV

**Breach of Contract: The USACE Breached its Duty to Verify ASA's Bid, Entitling ASA to Recover its Reliance Damages**

90. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

91. The Contracting Officer has a duty to review all bids for mistakes. This duty is set out in FAR § 14.407-1, which reads in part:

> After the opening of bids, contracting officers shall examine all bids for mistakes. In cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bid, calling attention to the suspected mistake.

92. As noted above, CLIN 006 (Levee Embankment, Semicompacted) comprised almost exactly two-thirds of ASA's overall extended bid amount. CLIN 006 bore the same relative weight in both the other offerors' bids and in the USACE's estimate.

93. ASA's unit price for CLIN 006 was $2.47 per CY. The next lowest bidder bid $3.21 for this line item. The USACE's estimate for CLIN 006 was $3.09. This means that ASA's bid for CLIN 006 was 23% lower than the next lowest bidder and 20% lower than the USACE's estimate for that line item. The gulf between ASA's CLIN 006 unit price and the corresponding USACE estimate is even more pronounced than 20%, as government estimates do not include profit. That latter point was confirmed in the Contracting Officer's Final Decision.

94. If one compares ASA's unit price for CLIN 006 with the average unit price submitted by all nine of the other bidders, it becomes clear that ASA's $2.47 per CY is even more of an outlier. Compared with the average unit price of the other nine bidders of $4.12,

ASA's unit price for CLIN 006 is 40% lower. These variances were readily calculable from the pre-award bid abstract prepared by the USACE.

95. Despite these gaping, unexamined, and unexplained variances between ASA's bid price for CLIN 006 and all other relevant measures of this pricing, the USACE never approached ASA to verify its bid unit price. The USACE snapped up ASA's offer notwithstanding the pricing anomalies and notwithstanding that the USACE was on the brink of directing action that would dramatically and irrevocably change for the worse the moisture contract of the borrow material; that is, directing the clear-cutting the borrow areas.

96. Any of the foregoing measures of the difference in the embankment unit pricing – roughly 23% to 40% -- is sufficient enough to have triggered the USACE's duty to request that ASA verify its bid. This is especially the case where the USACE knew what ASA did not – that the USACE was going to change a critical characteristic of the borrow area material post-award but pre-NTP that would have the effect of profoundly impacting ASA's approach to the earthwork operations.

97. The USACE as much as admits that it had a duty to verify ASA's bid, when it states in its Final Decision: "[o]btaining a contract of the magnitude of the 477-L contract based on limited experience and an unproven process was not a prudent action for you to take." Obviously, if ASA's plan was imprudent in hindsight (in the USACE's view, not ASA's), then it should have been equally as imprudent at the time of the bid opening.

98. Had the USACE triggered the bid verification process as it should have, ASA would have disclosed that its earthwork operation plan consisted of a just-in-time process using self-loading tractor and pan hauling units, relying on the soil-drying benefits of the interception and transpiration characteristics of the forested borrow areas.

99. In response, the USACE would have disclosed to ASA (for the first time) that it was going to clear-cut the borrow areas in advance of the NPT and that ASA's plan would not work.

100. ASA then would have re-bid CLIN 006, using top-loaded, off-road haulers, just as the other offerors had contemplated. If ASA had re-bid CLIN 006 to accommodate the effects of the clear-cutting (*i.e.*, top-loaded, off-road haulers), it would have calculated a higher unit price, reflecting the costs of more expensive equipment to perform the loading, hauling, and placement activities required to perform the changed earthwork operation.

101. If ASA had calculated a unit price that was at the midpoint of the range of the other nine bidders for CLIN 006 (a fair assumption), ASA would have re-calculated its pricing for that line item at $4.12 per CY. This would have resulted in ASA submitting an overall extended price that was $1,815,000 higher than ASA actual extended bid price ($4.12 less $2.47 times 1,100,000 CY). When that adjustment is added to ASA's base bid, ASA's pricing would have put it well out of the running for Contract award.

102. Because the USACE breached its duty to verify ASA's bid, ASA is entitled to be restored to the position that it would have occupied had it not been awarded the Contract to begin with.

103. On February 24, 2004, ASA submitted a properly certified claim in the amount of $1,881,206 that fairly implicated USACE's breach of its duty to verify ASA's bid.

104. In its Final Decision dated July 2, 2004, the USACE denied ASA's February 24, 2004 claim in its entirety.

105. ASA has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, ASA respectfully requests that the Court enter judgment against the USACE on Count IV, in the alternative to the relief requested in Counts I, II, and III, an amount yet to be determined but believed to be at least $1,881,206, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 27th day of June 2005.

Respectfully submitted,

**ASA Enterprises, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff