IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ASA ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-698C |
| | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>JOINT PRELIMINARY STATUS REPORT</u>

Pursuant to Appendix A, ¶¶ 3-5, of the Rules of the United States Court of Federal Claims, plaintiff, ASA Enterprises, Inc. ("ASA"), and defendant, the United States, submit this joint preliminary status report.

a. <u>Does the court have jurisdiction over the action</u>?

Plaintiff believes that the Court has jurisdiction over the action. At the present time, defendant questions the Court's jurisdiction only with respect to count IV of the complaint concerning the Corps of Engineers' alleged duty to verify ASA's bid because ASA did not present this issue to the contracting officer in its claim.

b. Should the case be consolidated with any other case and the reasons <u>therefor?</u>

At the present time, the parties agree that this case should not be consolidated with any other case.

c. Should trial of liability and damages be bifurcated and the reasons <u>therefor?</u>

The parties agree that the issues of liability and quantum should not be bifurcated.

d. Should further proceedings in this case be deferred pending consideration of another case before this court or any other tribunal and the reasons therefor?

The parties agree that this case should not be deferred.

e. In cases other than tax refund actions, will a remand or suspension be sought and the reasons therefor and the proposed duration?

Neither party seeks remand or suspension.

f. Will additional parties be joined and, if so, a statement describing such parties, their relationship to the case, and the efforts to effect joinder and schedule proposed to effect joinder?

Neither party intends to join additional parties at this time.

g. Does either party intend to file a motion pursuant to RCFC 12(b), 12(c), or 56 and, if so, a schedule for the intended filing?

Neither party anticipates filing any dispositive motions before the onset of discovery. However, during the course of discovery or following the completion of discovery, both parties reserve the right to file a dispositive motion if it believes that such a motion is appropriate.

h. What are the relevant factual and legal issues?

Plaintiff states:

Plaintiff brings this action under the provisions of the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609, following the Government's outright denial of ASA's certified claim. Plaintiff was awarded Contract No. DACW38-02-C-0026 (the Contract) by the United States Army Corps of Engineers (USACE) to enlarge certain earthen levees along the Mississippi River upstream of Vicksburg, Mississippi. The Contract required that ASA obtain new embankment material for enlarging the levees from three adjacent river bottom borrow areas, or pits. Following the submission of ASA's bid but prior to ASA's commencement of work under the

Contract, the USACE ordered the virtual total clear-cutting of the forestation in the designated borrow areas. This caught Plaintiff by complete surprise, as Plaintiff had relied on the presence of the borrow pit forestation for as long as possible into the excavation process so as to maximize the soil-drying effects of the forest's transpiration and rainfall interception characteristics. Immediately upon learning of this USACE-directed deforestation of the borrow pits, Plaintiff gave notice that the action constituted a Differing Site Condition (DSC) under the Contract. So profoundly did this denuding of the borrow pits affect ASA's planned means and methods of performance that ASA requested shortly following notice of award that the USACE terminate the Contract for its convenience.

Plaintiff's chief factual contentions are: (a) the USACE-directed clear-cutting deprived ASA of the soil-drying benefits of the forestation overlaying the borrow areas; (b) significantly wetter soil caused ASA's earthwork operations to take longer and to become less efficient; and (c) these delays and disruptions increased ASA's cost of performance. Entitlement is supported by a number of independent but complementary legal theories, including: (a) differing site condition; (b) constructive change; (c) USACE's failure to disclose superior knowledge; and (d) USACE's failure to verify ASA's bid.

(a) Differing Site Condition: The Contract documents clearly depicted forestation in all three borrow pits and impliedly indicated that the forestation thereby depicted would intercept rainfall and transpire underlying soil moisture. In reliance on these implied indications, ASA bid its embankment unit price assuming that it could employ the self-loading features of its planned hauling units and could otherwise employ just-in-time techniques in obtaining borrow material. The indications actually encountered differed materially from those represented in the Contract

documents, were reasonably unforeseeable, and caused Plaintiff damage. Of note, while the USACE admits that the clear-cutting of the borrow areas does constitute a DSC, it incongruously contends that the immutable properties of nature that were changed as a direct result of the deforestation somehow does not constitute a DSC.

(b) Constructive Change: Here, the USACE's deliberate act of clear-cutting the three borrow areas in advance of ASA's ability to conduct earthwork operations adversely affected the means and methods employed by ASA in performing its borrow, hauling, and embankment fill operations. This action, while permissible under the Contract's "Changes" clause, entitles ASA to an equitable adjustment for the additional cost incurred by it as a result of this change.

(c) USACE's Failure to Disclose Superior Knowledge: The risk of cost increases to ASA's borrow loading and hauling operation shifts from the contractor to the Government where the Government fails to disclose its "superior knowledge" of the vital facts on which the borrow loading and hauling costs depend. ASA is able to recover under this doctrine because: (i) ASA undertook to perform without vital knowledge of a fact that affects performance costs or duration (the interception and transpiration characteristics of the forestation); (ii) the Government was aware that the contractor had no knowledge of and had no reason to obtain such information (see Government's Answer, ¶¶ 12, 37); (iii) any contract specification supplied misled the contractor, or did not put it on notice to inquire (see Government's Answer, ¶¶ 12, 13); and (iv) the Government failed to provide the relevant information (see Government's Answer, ¶¶ 11).

(d) USACE's Failure to Verify ASA's Bid: Under Federal Acquisition Regulation (FAR) 14.407-1, a contracting officer has the duty to verify a contractor's bid in the event of a suspected mistake. ASA's bid for embankment, which comprised roughly two-thirds of the

overall contract work scope, was approximately 23% lower than the next lowest bidder's unit price for that item. Compared with the average unit price of the other nine bidders for the embankment line item, ASA's embankment bid was 40% lower. Despite these gaping, unexamined, and unexplained variances between ASA's bid price for the embankment line item with all other relevant data points, the USACE never approached ASA to verify its bid unit price for this item. Instead, its snapped up ASA's offer and then unveiled and began the virtual total clear-cutting of the borrow pits. Had the USACE triggered the bid verification process as it should have, ASA would have disclosed that its earthwork operation plan consisted of a just-in-time process using self-loading tractor and pan hauling units, relying on the soil-drying benefits of the interception and transpiration characteristics of the forested borrow areas. In response, the USACE would have disclosed to ASA (for the first time) that it was going to clear-cut the borrow areas in advance of the Notice to Proceed and that ASA's plan would not work. ASA then would have re-bid the embankment work using top-loaded, off-road haulers, just as the other offerors had contemplated. By so doing, ASA would have submitted a higher unit price for that work that would have placed ASA's overall bid price well behind the next lowest bidder's overall bid price, and thus, would not have been awarded the Contract. Because the USACE breached its duty to verify ASA's bid, ASA is entitled to be restored to the position that it would have occupied had it not been awarded the Contract to begin with.

Defendant states:

On June 21, 2002, the Army Corps of Engineers awarded ASA the contract at a value of $4,073,516. The contracted provided for completion within 310 calendar days with an exclusion period from January 1 to May 31 in which no work was to be performed and which did not count

in computing completion time. The Corps issued a notice to proceed on August 2, 2002 which established November 6, 2003 as the completion date. Because of excusable weather delays, as of the time of the contracting officer's final decision, the Corps had extended the completion date by more than one year, until December 31, 2004.

Prior to ASA commencing work, the private owner of the borrow sources began clear cutting the trees in the borrow sources. The contract did not state that the trees would be clear cut in this manner. The Corps agreed that this clear cutting was a differing site condition and agreed to a contract modification increasing the contract amount by $180,000 for additional work relating to the clearing and grubbing of trees.

Although the Corps agreed to the clearing and grubbing contract modification, it does not agree that ASA is entitled to an additional payment relating to an alleged increase in moisture in the borrow sources. The Corps denies that there was a material increase in the borrow source moisture at the time of award or immediately thereafter. Moreover, its comparison of soil samples taken in the borrow source areas in April of 2001 (pre-bid) and April of 2003 (post-bid) indicate that there was an average increase of approximately two percent in the moisture content. This slight increase is not material and is, in any event, explained by two events. First, rainfall during the course of ASA's work was far in excess of normal. During the 2002 work season (August 3 to December 31), rainfall was approximately 58 percent greater than normal. Measurable rain fell on 47 days during this time period, with the average rain event measuring 0.72 inches. During the 2003 work season, rain fall was 13 percent greater than normal. As stated above, the adverse weather resulted in lengthy extensions to the contract time. Second, the borrow sources are located adjacent to the Mississippi River in an area that floods in the spring.

The river positively recharges ground water in the borrow areas and is a significant source of ground water in the area. Based upon these conditions, the contracting officer found that in the 2002 and 2003 work seasons there were 378 days in which the semi-compacted embankment activity was critical, but 231 of these days were unsuitable because of adverse weather and resulting wet conditions and high river stages.

Defendant denies that the Corps had superior knowledge as alleged by ASA. The Corps was unaware that ASA intended to use the "just in time" method of clearing borrow areas. Such a method had never previously been observed by the Vicksburg District of the Corps.

Defendant also states that even if ASA establishes liability, it has not submitted a method of calculating damages that establishes its damages to a reasonable degree of certainty. ASA submitted two methods of calculating damages to the contracting officer: a "measured mile" method and a modified total cost method. The measured mile analysis did not compare ASA's work to an "unimpacted" portion of this project, but rather to another project (the "Commerce" project) on which it was a subcontractor. The contracting officer found that the Commerce project had significant differences from the project at issue, including shallower excavation depths, no moisture control limits on placed material, no minimum compaction limits on placed materials, and the absence of difficult to excavate silt materials.

ASA's modified total cost claim is actually a total cost claim since it does not deduct any costs which are the responsibility of ASA from the total cost claim. ASA's claim has not been audited. Defendant is attempting to hire an independent auditor to audit the claim.

Defendant states that the relevant factual and legal issues include:

1. Whether the Court possesses jurisdiction to consider count IV of ASA's complaint because this issue was not presented to the contracting officer.

2. Whether the moisture content of the soil in the borrow sources at the time of award varied in a material manner from that represented in the contract documents.

3. If ASA can demonstrate that the moisture content of the soil in the borrow sources varied in a material manner from that represented in the contract documents, whether this variation was caused or contributed to by the removal of the trees by the borrow source owner prior to ASA commencing work.

4. If ASA can demonstrate that the moisture content of the soil in the borrow sources varied in a material manner from that represented in the contract documents, whether this variation was caused or contributed to by abnormally high rainfall during the work seasons.

5. If ASA can demonstrate that the moisture content of the soil in the borrow sources varied in a material manner from that represented in the contract documents, whether this variation was caused or contributed to by the borrow sources proximity to the Mississippi River.

6. If ASA can establish liability, whether ASA's damages calculations establish its damages with a reasonable degree of certainty:

   A. Whether the Commerce levee enlargement project is sufficiently similar to the project at issue in this action so that ASA may compare its work on the two projects in a "measured mile" damages calculation.

B. Whether ASA meets the following criteria for establishing damages through a total cost method: 1) whether any other method of calculating damages impractical; 2) whether ASA's bid was reasonable; 3) whether its actual costs were reasonable; and 4) whether ASA was responsible for its additional expenses.

i. What is the likelihood of settlement? Is alternative dispute resolution contemplated?

The parties have not yet engaged in settlement discussions. The parties believe that, at this time, they cannot predict the likelihood of settlement.

j. Do the parties anticipate proceeding to trial? Does any party, or do the parties jointly, request expedited trial scheduling and, if so, the reasons why the case is appropriate therefore?

Unless a settlement is reached, the parties anticipate proceeding to trial. Neither party requests an expedited trial.

k. Are there special issues regarding electronic case management needs?

At the present time, the parties are unaware of any special issue regarding electronic case management needs.

l. Is there other information of which the court should be aware at this time?

The parties are unaware of any other information that should be brought to the Court's attention at this time.

PROPOSED DISCOVERY PLAN

| Date | Event |
|---|---|
| 8/31/06 | Conclusion of all non-expert discovery |
| 9/30/06 | Disclosure of expert reports |

| | |
|---|---|
| 11/17/06 | Conclusion of expert depositions |

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John C. Person
JOHN C. PERSON
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, DC 20006
(202) 466-4434 - phone
(202) 466-4416

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O’Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282
Attorneys for Defendant

Dated: October 14, 2005